UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BRUCE FERRELL, | : |
| | : |
| Plaintiff | : |
| | : |
| v. | : CIVIL NO. 3:CV-01-0924 |
| | : |
| JEFFREY BEARD, et al., | : (Judge Kosik) |
| | : |
| Defendants | : |

**M E M O R A N D U M**

**I.   Introduction**

This consolidated civil rights action pursuant to 42 U.S.C. § 1983 was filed by Bruce Ferrell, an inmate currently confined at the State Correctional Institution at Fayette, Pennsylvania, on May 24, 2001.[1] Named as Defendants are Jeffrey Beard, Secretary of the Department of Corrections ("DOC"), and the following former employees at the State Correctional Institution at Camp Hill ("SCI-Camp Hill"), Pennsylvania, Plaintiff's former place of confinement: Martin Dragovich, Superintendent; John Palakovich, Deputy Superintendent for Facility Management; Robert Novotney, Superintendent for Facility Management; Blaine Steigerwalt, Unit Manager in the Special Management Unit ("SMU")[2]; and David Maeyer, Business Manager.  On March 22, 2002, Plaintiff's motion to add Sarah B. Vanderbrook Meart, former Chief Counsel of the DOC, as a defendant in this

---

[1] A second complaint filed on June 25, 2001 was consolidated into the above-captioned action on July 6, 2001.  (See Doc. 8, Civil Action No. 3:CV-01-1135.)

[2] Steigerwalt is currently still employed at SCI-Camp Hill, but now serves as Unit Manager of Blocks F and H.

action was granted. (Doc. 34.) In the complaint Plaintiff contends that he was subjected to retaliation and denied access to the courts in conjunction with his transfer from the State Correctional Institution at Greene, Pennsylvania ("SCI-Greene") to the SMU at SCI-Camp Hill, and then subsequently to the Long Term Segregation Unit ("LTSU") at the State Correctional Institution at Pittsburgh (SCI-Pittsburgh). The case has a tortured procedural history which is fully set forth in the detailed opinions previously issued by this Court, and will not be reiterated herein. Numerous discovery and other miscellaneous motions have been filed and resolved. Defendants have filed a motion for summary judgment (Doc. 111) which is ripe for consideration. For the reasons that follow, the motion will be granted.

## II.     Factual Background

Plaintiff is serving a five (5) to ten (10) year sentence for robbery. The effective date of his sentence was March 27, 1999, with minimum and maximum sentence expiration dates of March 27, 2004, and March 27, 2009. (Doc. 130, Southers Declar. ¶ 6; Doc. 164, Ex. A, Sentence Status Summary.) Plaintiff's sentence was a "continuation sentence" resulting from a re-entry detainer that took effect after he finished serving back-time for a parole violation.[3] On November 22, 1999, Plaintiff was transferred from SCI-Greene to the SMU at SCI-Camp Hill. (Doc. 130, Southers Declar. ¶ 7.) The SMU is a specialized area within SCI-Camp Hill where inmates from various DOC institutions are assigned when they exhibit dangerous or unduly aggressive behavior over an extended period of time during their incarceration. This unit offers a prescriptive program designed to encourage cooperation and compliance with prison rules through positive reinforcement.

---

[3] At the time Plaintiff was sentenced on the robbery charge, he was on active parole from a previous conviction. He was recommitted by the Pennsylvania Board of Probation and Parole to complete all back-time before he would begin his new sentence. Plaintiff completed his back-time on January 3, 2000, at which point he began to serve the robbery sentence. (Doc. 164, Ex. A, Hale Declar. ¶ 7 and Sentence Status Summary; Ex. B, 2/11/00 Letter.)

2

When an inmate is first confined in the SMU, he is extremely limited in his privileges. As he progresses through the program, he earns greater privileges. The goal is release back into the general population which has the greatest degree of privileges. (Doc. 164, Ex. G.) Plaintiff was transferred to the SMU because he consistently exhibited dangerous and uncooperative behavior at SCI-Greene. In the calendar year 1999 alone, Plaintiff's actions included lying to an employee, destroying/damaging property, and repeated instances of assault, threatening an employee, refusing to obey orders, possession of contraband and using abusive or obscene language.[4] He was transferred as a Phase 5 Disciplinary custody status inmate. Phase 5 is the category reserved for inmates who pose the most serious threats to the prison. (Doc. 130, Southers Declar. ¶ 8.)

Following his arrival in the SMU Plaintiff admits that he refused to cooperate with staff there. Plaintiff contested his confinement in the SMU, and made repeated complaints about the denial of access to personal property. Inmates in the SMU are not permitted to possess unlimited amounts of personal material in their cells, including legal property. Upon his transfer to the SMU from SCI-Greene, Plaintiff was permitted to bring two (2) boxes of legal property and a television. While Plaintiff had eleven (11) more boxes of personal property, these were not shipped to SCI-Camp Hill until one month later. Plaintiff was advised that he had to select the property he would keep at SCI-Camp Hill, and the property he wished to have shipped elsewhere outside of the prison. (Doc. 130, Southers Declar. ¶20.) Although Plaintiff was always permitted access to his property by submitting request slips, he would often interfere with the staff's efforts to accommodate him and overall did not adjust in a positive way to the SMU. (Doc. 130, Steigerwalt Declar. ¶¶ 4, 5.) After arriving at the SMU, Plaintiff received eight (8) misconducts, accumulating 750 days of disciplinary

---

[4] Plaintiff's behavior while confined at SCI-Greene is well documented by both Plaintiff's own submissions as well as Defendants' submissions. (Doc. 130, Southers Declar. ¶ 9; Doc. 164, Plaintiff's Ex. G, Ward Aff. ¶¶ 6-8; Plaintiff's Ex. B.)

3

custody to be added to the number he received while at SCI-Greene. This brought his disciplinary maximum date to August 22, 2004. (Id., Southers Declar. ¶ 25.) Plaintiff began to spread feces all over himself, his cell walls and the floor. He disputes that he ever threw waste at the officers. He does not dispute threatening to throw waste upon the SMU staff, urinating in his cell to wash the feces out onto the tier, and refusing to flush his toilet in an attempt to clog the pipes to spew his wastes onto the tier. Plaintiff also refused to attend Program Review Committee meetings which were scheduled once a month. (Id., ¶¶ 27 - 33.) Despite complaints about possessing as much personal property as he wished, Plaintiff would interfere with efforts to provide him with materials by threatening to throw waste at staff attempting to approach his cell. On several occasions Plaintiff was placed in a psychiatric observation cell in the prison's infirmary due to this conduct in addition to engaging in a hunger strike.

Plaintiff was ultimately considered to be an SMU program failure because of his refusal to progress from Phase 5 or participate in any way with the SMU programming. (Doc. 130, Southers Declar. ¶28; Doc. 164, Ex. B, 2/2/00 Continuation Psychological Eval.; 12/11/00 Misconduct Report; Doc. 130, Dragovich Declar. ¶¶ 11, 12.) SMU staff thereafter detailed all the events which had occurred and recommended to Superintendent Dragovich that he seek Plaintiff's transfer to the Long Term Segregation Unit (LTSU). After submitting a petition to the Central Office and obtaining DOC Secretary Beard's approval, Plaintiff was transferred on February 12, 2001, to the LTSU at SCI-Pittsburgh. (Doc. 130, Southers Declar. ¶31; Beard Declar. ¶¶ 13-14; Brandt Declar. ¶ 14.)

Plaintiff's property exceeded the amount he was permitted to take to SCI-Pittsburgh. The policy at that time was that a prisoner could take with him at prison expense two record boxes and a television box for shipment on the bus or van which transported him. A standard size footlocker could be substituted for the two boxes. (Id., Southers Declar. ¶ 17.) Plaintiff was informed by

4

Defendant Steigerwalt that the excess would be shipped by the least expensive common carrier available at Plaintiff's own expense. (Doc. 130, Steigerwalt Declar. ¶ 18.) Plaintiff took two record boxes and a television box with him. In August of 2001, Defendant Maeyer, the Business Manager at SCI-Camp Hill, was asked by Dragovich to respond to a request from Plaintiff as to the amount it would cost him to have his remaining boxes of property at SCI-Camp Hill shipped to him at SCI-Pittsburgh. (Doc. 130, Maeyer Declar. ¶ 3; Doc. 164.) Maeyer responded on August 21, 2001 by informing Plaintiff that he had ten (10) boxes of property which would cost $78.90 to ship. He was further informed that he had a negative $1,445.40 balance on his institution account (Doc. 164, Plaintiff's Ex. D.) In October of 2001, Plaintiff submitted requests to the Business Office at SCI-Camp Hill seeking to have his property shipped to SCI-Pittsburgh. He was again informed by Maeyer of his negative balance, and told that to have the property shipped, he would either need to have the funds available in his account or authority from the courts or the DOC permitting the Business Office to "anticipate" funds on his account to pay for the costs of shipping. Nothing was ever received by Maeyer authorizing him to anticipate funds on Plaintiff's account. In 2002, Plaintiff submitted request slips, letters and three (3) grievances with regard to this issue. Plaintiff disputes the negative balance claiming that it arose under his prior sentence and, therefore, was extinguished when service of that sentence was completed. In April of 2002, in response to Plaintiff's grievances, Ian Taggart, Assistant to the Superintendent at SCI-Camp Hill, contacted the DOC Central Office regarding Plaintiff's requests that his personal property be shipped for free. (Doc. 130, Taggart Declar. ¶ 21.) After discussions, it was decided that the prison would ship the 10 boxes of property on the DOC's buses scheduled to travel to SCI-Pittsburgh when space was available. Plaintiff was informed of this decision on April 2, 2002. (Id., Ex. 2.) The property was ultimately shipped some time prior to April 16, 2002. (Id., Taggart Declar. ¶ 23.)

5

### III. Standard of Review

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment. The substantive law determines which facts are material. Id. at 248. A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id. at 250. If the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'." Matsushita Elec. Industrial Co. v. Zenith Radio, 475 U.S. 574, 587 (1986)(citing First Nat. Bank of Ariz. v. Cities Service Co., 391 U.S. 253, 289 (1968)). All inferences, however, "'should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true'." Pastore v. Bell Tel. Co. of Pennsylvania, 24 F.3d 508, 512 (3d Cir. 1994)(citing Big Apple BMW, Inc. v. BMW of N. America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992); Wicker v. Consol. Rail Corp., 142 F.3d 690, 696 (3d Cir. 1998).

The moving party bears the initial responsibility of stating the basis for its motion, identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). As a general rule, unsubstantiated arguments made in briefs are not considered evidence of asserted facts. Versarge v. Township of Clinton, 984 F.2d 1359, 1370 (3d Cir. 1993). The moving party must present competent evidence to support his

6

version of events.  Likewise, the nonmoving party "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." Williams v. Borough of West Chester, 891 F.2d 458, 460 (3d Cir. 1989)(citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986)). The nonmoving party cannot "simply reassert factually unsupported allegations contained in [the] pleadings." Williams, 891 F.2d at 460 (citing Celotex, 477 U.S. at 325).  "Once the moving party has carried the initial burden of showing that no genuine issue of material fact exists, the nonmoving party ... 'must make a showing sufficient to establish the existence of every element essential to his case, based on the affidavits or by the depositions and admissions on file'." Pastore, 24 F.3d at 511 (citing Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992)).  If the evidence in favor of the nonmoving party is merely colorable or not significantly probative, summary judgment should be granted.  Boyle v. County of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998)(citing Matsushita Elec. Indus., Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

## IV.   Discussion

### A.   Exhaustion of Administrative Remedies

In moving for summary judgment Defendants argue they are entitled to summary judgment because Plaintiff has failed to exhaust his administrative remedies with respect to his claims.  Under the Prison Litigation Reform Act ("PLRA"), exhaustion of administrative remedies is required for all actions concerning prison conditions brought under federal law.  See 42 U.S.C. § 1997e(a); Woodford v. Ngo, 126 S. Ct. 2378 (2006).  The "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  Porter v. Nussle, 534 U.S. 516 (2002).  "The PLRA attempts to eliminate unwarranted federal-court interference with the administration of prisons, and thus seeks to afford corrections officials time and opportunity to address complaints

7

internally before allowing the initiation of a federal case." Woodford, 126 S. Ct. at 2387 (internal quotation and citation omitted). "The benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance." Id. at 2388.

The PLRA mandates that inmates "properly" exhaust administrative remedies before filing suit in federal court. Id. at 2387. "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." Id. at 2386. Failure to substantially comply with procedural requirements of the applicable prison's grievance system will result in a procedural default of the claim. Spruill v. Gillis, 372 F.3d 218, 227-32 (3d Cir. 2004). The PLRA "completely precludes a futility exception to its mandatory exhaustion requirement." Nyhuis v. Reno, 204 F.3d 65, 71 (3d Cir. 2000).

A prisoner does not have to allege in his compliant that he has exhausted administrative remedies. Ray v. Kertes, 285 F.3d 287 (3d Cir. 2002). Failure to exhaust available administrative remedies is an affirmative defense. (Id.)  As such, it must be pleaded and proven by the Defendants. Brown v. Croak, 312 F.3d 109, 111 (3d Cir. 2002).

At the relevant time, the Pennsylvania Department of Corrections had and continues to have a Consolidated Inmate Grievance Review System. (Doc. 130, Taggart Declar., Ex. 1.) Pursuant to the existing procedure, an inmate is first required to make every effort to resolve an issue informally. Failure to attempt informal resolution will be considered in any appeal. (See DC-ADM 804 VI. A(5)). If an inmate is dissatisfied following attempts at informal resolution, he can file a grievance with the Facility Grievance Coordinator. Any appeal from the decision of the Grievance Coordinator is filed with the Facility Manager/Superintendent. An inmate can then pursue a final written appeal to the Secretary's Office of Inmate Grievances and Appeals. The Consolidated Inmate Grievance

Review System sets forth specific mandates to which an inmate must adhere including time limitations and appeal requirements.[5]

Defendants maintain that none of Plaintiff's claims are exhausted. In support of their argument, they offer the declaration of Ian Taggart, Assistant to the Superintendent at the State Correctional Institution at Camp Hill. As part of Taggart's duties, he serves in the position as Grievance Coordinator for the DOC. (Doc. 130, Taggart Declar. ¶¶ 1,2.) According to Taggart, the DOC inmate tracking system reveals that Plaintiff submitted the following 5 grievances in the year 2000 while at SCI-Camp Hill wherein he complained about legal matters: CAM-0210-2000; CAM0292-2000; CAM-0296-2000; CAM-0324-2000; and CAM-0439-2000. (Id. at ¶ 9.) In the year 2001, Plaintiff submitted 2 grievances wherein he complained about his property being withheld: CAM-0031-2001 and CAM-0130-2001. (Id. at ¶ 10.) Taggart states that none of the grievances submitted in 2000 set forth any claims against Defendants named in this action. Rather, they contest actions taken by William Ward, former SMU Manager at SCI-Camp Hill, and Robert Gimble, an SCI-Camp Hill Business Office employee. Plaintiff does, however, submit evidence that CAM-210-2000 is exhausted through the final appeal level. (Doc. 164, Plaintiff's Ex. D.) This fact has no relevance for purposes of this action in that the only individual named in said grievance and addressed in the responses thereto is William Ward, who is not a defendant in this action. Nothing

---

[5] Plaintiff challenges the copy of DC-ADM 804 submitted by Defendants as an exhibit to Ian Taggart's declaration in that the effective date of said policy statement is listed as January 3, 2005. He appears to raise this challenge because his claims arose, and he filed this action, well before the effective date of the particular version of DC-ADM 804 submitted. Plaintiff's challenge to the application of DC-ADM is not well taken in that, while this is the most recent version of DC-ADM 804, all of the prior versions set forth a three-tiered review procedure requiring initial review, appeal from initial review and then final review. While some change has occurred over the years, for example, with respect to where appeals were to be filed, i.e., Central Office Review Committee vs. Chief Hearing Examiner vs. Secretary's Office of Inmate Grievance and Appeals, the underlying system has always been the same.

9

else contained in the voluminous record submitted by Plaintiff in opposition to Defendants' motion disputes the fact that the remaining 4 grievances filed in 2000 are unexhausted.

There is no question that the 2 grievances filed by Plaintiff in 2001 set forth claims against Defendant Steigerwalt and relate to claims in this action - - the withholding of legal property/failure to ship property to SCI-Pittsburgh. Defendants maintain through Taggart's declaration that neither grievance was exhausted through the final level of available appeal, and that CAM-130-2001 fails to identify any Defendant. (Id. at ¶ 19.) Plaintiff, however, submits documentation which establishes that CAM-0130-2001 sets forth complaints against Defendant Steigerwalt, and was pursued through the final level of appeal. As such, this grievance is exhausted for purposes of review by this Court. (Doc. 164, Plaintiff's Ex. D.)

While Defendants state that numerous additional request slips and letters complaining about various issues were submitted, Plaintiff only filed 3 other grievances (on or about March 25, 2002), and they pertained to the shipment of his 10 boxes of property from SCI-Camp Hill to SCI-Pittsburgh. Both Defendants and Plaintiff submit evidentiary materials which establish that Taggart contacted the Central Office in response to these grievances, and it was decided that these boxes would be shipped for free on the DOC's buses scheduled to travel to SCI-Pittsburgh. The record further establishes that the boxes were, in fact, shipped for free some time before April 16, 2002. (Doc. 130, Taggart Declar. ¶ 23 and Ex. 2; Doc. 164, Plaintiff's Ex. D.)

In attempting to further contest Defendants' exhaustion argument, Plaintiff claims that other grievances he did file were either never entered into or deleted by Defendants from the grievance tracking system. He submits evidence that he filed the following grievances not set forth by Defendants: CAM-855-1999; CAM-869-1999; CAM-889-1999; CAM-890-1999; CAM-0015-2000;

10

CAM-673-2000; CAM-0022-2000; CAM-6776-2001; and CAM-4743-2001.[6] Many of these grievances were either not exhausted to the final level of appeal or dismissed without consideration because Plaintiff failed to attempt informal resolution or follow the appropriate steps in the inmate grievance procedure. (Doc. 164, Plaintiff's Ex. E, G.) The remaining grievances which do appear to be exhausted involve non-Defendants or issues not set forth in this action. (Id., Ex. B, D, E and G.)

The only other argument advanced by Plaintiff in opposition to Defendant's exhaustion argument is that Defendants failed to process some of his grievances/enter them into the system. The evidentiary materials submitted in this case are many. In reviewing the entire record, there is no question of material fact that there were occasions that Defendants did not process grievances submitted by Plaintiff. However, the record is also replete with support for the basis in not processing certain grievances. These reasons, supported by evidence submitted by both Defendants and Plaintiff himself, include repetitive grievances, failure to first attempt informal resolution and failure to follow the necessary grievance channels as set forth in the Consolidated Inmate Grievance Review System. (See Doc. 164, Plaintiff's Exs. C, E and H.) Based on the foregoing, with the exception of the claims raised in grievance CAM-130-2001 against Defendant Steigerwalt, all other claims appear to be unexhausted, thereby warranting the entry of summary judgment in favor of all other Defendants on the basis of exhaustion.

B.    **Claims in Grievance CAM-130-2001**

Plaintiff filed grievance CAM-130-2001 on January 19, 2001, while confined at SCI-Camp Hill. In the grievance he asserts that he is filing the grievance against Blaine Steigerwalt who has

---

[6] Plaintiff further references several grievances filed during the year 1998 while he was confined at SCI-Greene which clearly pre-date the claims set forth in the instant action. (Doc. 164, Plaintiff Ex. G.) He also includes a grievance filed after the commencement of this lawsuit (April 23, 2002) against two non-Defendants regarding issues not part of this action.

11

denied him his legal property since January 9, 2001, thereby depriving him of access to the courts to file lawsuits and criminal appeals.  He admits in the grievance that the reason for the alleged deprivation of property is due to the fact that Plaintiff refused to stop smearing feces and urine in his cell.  Plaintiff argues that Defendant cannot use the deprivation of his property as a tool to get him to stop his behavior.  (Doc. 164, Plaintiff's Ex. D, 1/19/01 Grievance.)  From the submissions in the record, it appears that shortly after filing this grievance, Plaintiff was transferred to the LTSU at SCI-Pittsburgh on February 12, 2001.  Through the appeals of this grievance, Plaintiff continued to seek the return of his legal property which apparently was still being held at SCI-Camp Hill.  According to a copy of the decision on final review with regard to this grievance issued May 30, 2001, it was decided that Plaintiff was not entitled to have his legal property remaining at SCI-Camp Hill shipped to him because he showed a negative balance in his inmate account of $1,394.85 at that point.

      Nowhere in this entire voluminous record does Plaintiff dispute the fact that he was a behavior problem during his confinement in the DOC.  This is well documented throughout the submissions.  Further, there are numerous places in the record where Plaintiff admits that he engaged in throwing feces and urine all over his cell in the SMU at Camp Hill, as well as engaged in other activities in an effort to spew his excretions out of the cell and into the tier.  Defendants submit declarations and there are many documents establishing Defendants attempts to control Plaintiff's behavior and maintain control and sanitation at the prison.  While there is evidence establishing that property was withheld from Plaintiff so that it would not be among the mess created by him, there is also evidence substantiating Defendants' declarations that Plaintiff was never deprived of access to his legal materials, and could always request access if needed.  The record contains ample support that during his confinement on the occasions Defendants did attempt to provide Plaintiff with access to his legal materials, Plaintiff failed to cooperate and, at times, would refuse the property.  (Doc.

12

130, Southers Declar. ¶¶16, 18, 33 and Ex. 2 Responses to Inmate Requests and Grievances; Steigerwalt Declar. ¶5; Plaintiff's Ex. D, Response to 2/1/01 Grievance; Ex. G, Responses to Inmate Requests; Ward Memo/Affidavit.)  Thus, while Plaintiff attempts to set forth an access to the courts claim in his grievance, he is unable to support such a claim.  Although actual injury is a necessary requirement in stating an access to the courts claim, see Lewis v. Casey, 518 U.S. 343, 351-54 (1996), and Plaintiff does come forth with exhibits demonstrating that appeals to the Pennsylvania Supreme Court were dismissed during the relevant time period for failure to perfect or file briefs, the undisputed record establishes that Plaintiff was a proponent of his own demise.  While Plaintiff unquestionably was denied possession of his legal materials from time to time, such deprivation was a result of his own admitted conduct.  During these periods, Plaintiff was afforded the opportunity of access, however he chose not to cooperate with Defendants' efforts to accommodate him.  Further, the many evidentiary materials submitted by Plaintiff in opposition to Defendants' motion certainly support the conclusion that during the relevant time period he was a prolific filer of documents including inmate request slips, correspondence and grievances.

   While Plaintiff attempts to convince this Court that Defendant retaliated against him by withholding his legal materials because of his behavior in throwing feces and urine all over his cell, any claim of retaliation is clearly unsupported by the undisputed facts in the record.  Actions taken in retaliation for the exercise of a constitutional right can form the basis of a § 1983 complaint, even when the act, taken for a different reason, might have been legitimate.  See White v. Napoleon, 897 F.2d 103, 111-12 (3d Cir. 1990).  A plaintiff alleging retaliation bears the initial burden of showing that (1) he was engaged in a constitutionally protected activity; (2) that he suffered an "adverse action" at the hands of prison officials; and (3) that this constitutionally protected activity was the substantial or motivating factor in the prison officials' decision to discipline the plaintiff.  Mitchell v.

Horn, 318 F.3d 523, 530 (3d Cir. 2003)(citing Allah v. Seiverling, 229 F.3d 220, 225 (3d Cir. 2000). The burden then shifts to the defendant to show by a preponderance of the evidence that the plaintiff would have received the same punishment, or alternatively stated, that defendant would have taken the same action, absent the retaliatory motive for reasons reasonably related to a legitimate penological interest. Rauser v. Horn, 241 F.3d 330, 333-34 (3d Cir. 2001).

Grievance CAM-130-2001 can fairly be read to assert that Defendant Steigerwalt retaliated against Plaintiff by depriving him of legal property due to his smearing feces and urinating all over his cell.[7] Even taking Plaintiff's assertion as true, Defendants are still entitled to summary judgment on the retaliation claim. Plaintiff is clearly unable to establish that engaging in such conduct is constitutionally protected activity. Further, even if Plaintiff could demonstrate constitutionally protected activity, he has not demonstrated in the record before the Court that Defendants' actions failed to further legitimate state interests. In fact, the record supports the contrary conclusion. (See Doc. 130 Southers Declar. ¶¶ 16, 17-18, 26, 30; Beard Declar. ¶¶ 13-15; Steigerwalt Declar. ¶¶ 3-4, 7.) Thus, even if Plaintiff's claim of retaliation were viable, Defendants are still entitled to summary judgment.

Plaintiff also contends throughout not only grievance CAM-130-2001, but the entire record that the debt referred to by Defendants as the basis for not shipping his excess property from SCI-Camp Hill arose under his "old commitment," and therefore no longer existed when he was transferred. His claim is without merit. The record is undisputed that at the time Plaintiff was transferred from SCI-Greene, he had incurred a substantial debt in his inmate account. (Doc. 130,

---

[7] In fact, throughout his consolidated complaint Plaintiff asserts that Defendants retaliated against him by confining him in a psychiatric observation cell, transferring him to the LTSU at SCI-Pittsburgh, restricting his access to his legal and religious property, etc. - - all because he refused to stop smearing his feces and urine in his cell. (See Doc. 1, Compl. ¶ 27.)

14

Maeyer Declar., Ex. 2.)  Despite Plaintiff's unfounded belief that this debt was magically "extinguished" when he was transferred to the SMU at SCI-Camp Hill, the debt continued on with him through his Department of Corrections transfers.  Finally, Defendants argument that any claim regarding the shipment of the 10 boxes from SCI-Camp Hill to SCI-Pittsburgh is moot is well-taken.  The grievance submitted challenging the shipment of this property was March 25, 2002.  By mid April 2002, the property had been shipped for free via prison buses to SCI-Pittsburgh. Thus, the matter was resolved within the prison grievance system, precisely the purpose behind administrative review.   Based on the foregoing, the Court finds that Defendant Steigerwalt in entitled to summary judgment with regard to all claims raised against him.

**V.     Conclusion**

For the reasons set forth above, Defendants' motion for summary judgment (Doc. 111) will be granted.  An appropriate Order is attached.

UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BRUCE FERRELL, | : |
| | : |
| Plaintiff | : |
| | : |
| v. | : CIVIL NO. 3:CV-01-0924 |
| | : |
| JEFFREY A. BEARD, et al., | : (Judge Kosik) |
| | : |
| Defendants | : |

**O R D E R**

**NOW,** this 28th day of **SEPTEMBER, 2006,** for the reasons set forth in the foregoing Memorandum, **IT IS HEREBY ORDERED THAT:**

1. Defendants' Motion for Summary Judgment (Doc. 111) is **GRANTED.**

2. The Clerk of Court is directed to enter judgment in favor of all Defendants and to mark this matter **CLOSED**.

　　　　　　　　　　　　　　　　　　　　s/Edwin M. Kosik
　　　　　　　　　　　　　　　　　　　　United States District Judge